AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
APR 0 6 2018

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

One Apple iPhone, Model A1549,
FCC ID: BCG-E2816A, IC: 579C-E2816A,
IMEI: 355786073235090

Case No. **18MJ1629**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein.

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960, and 963 | Importation of and Conspiracy to Import Methamphetamine |

The application is based on these facts:

See attached affidavit of HSI Special Agent Timothy O'Sullivan, incorporated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Timothy O'Sullivan, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/6/18

*Judge's signature*

City and state: San Diego, CA       Hon. William V. Gallo, Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>(1) One Apple iPhone, Model A1549, FCC ID: BCG-E2816A, IC: 579C-E2816A, IMEI: 355786073235090; and<br><br>(2) One Apple iPhone, Model A1784, FCC ID: BCG-E3092A, IC: 579C-E3092A. | **AFFIDAVIT OF SPECIAL AGENT TIMOTHY O'SULLIVAN IN SUPPORT OF SEARCH WARRANT** |

I, Special Agent Timothy O'Sullivan, having been duly sworn, declare and state as follows:

## I

## INTRODUCTION

1.  I make this affidavit in support of an application for a warrant to search:

    a)  One Apple iPhone, Model A1549, FCC ID: BCG-E2816A, IC: 579C-E2816A, IMEI: 355786073235090 (Target Device 1), and

    b)  One Apple iPhone, Model A1784, FCC ID: BCG-E3092A, IC: 579C-E3092A (Target Device 2) (collectively, the Target Devices),

and seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 952, 960, and 963, Unlawful Importation of a Controlled Substance and Conspiracy to Unlawfully Import a Controlled Substance (the Target Offenses).

2. The Target Devices were seized from Defendant Juan Sanchez-Arce (Defendant) at the time of his arrest for Importation of Methamphetamine on March 9, 2018, at the Otay Mesa, California Port of Entry. The Target Devices are currently in the possession of Homeland Security Investigations as evidence in the evidence vault located at 880 Front Street, Suite 3300, San Diego, CA.

3. This search of the Target Devices supports an investigation and prosecution of Defendant for the Target Offenses. Based on the information below, there is probable cause to believe that a search of the Target Devices, as described in Attachments A-1 and A-2, will produce evidence of the Target Offenses, as described in Attachments B-1 and B-2.

4. The following is based upon my experience and training, investigation, and consultation with other law enforcement agents and officers experienced in narcotics violations, including the Target Offenses. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because I make this affidavit for the limited purpose of obtaining a search warrant for the Target Devices, it does not contain all of the information known by me or other federal agents regarding this investigation, but only sets forth those facts believed to be necessary to establish probable cause. Dates and times are approximate, and refer to Pacific Standard Time (PST) unless otherwise specified.

## II
## AFFIANT'S EXPERIENCE AND TRAINING

5. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am also a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I

am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

6. I am a Special Agent (SA) with Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been so employed since November 2010. I am currently assigned to the Deputy Special Agent in Charge, San Ysidro Office, Contraband Smuggling Group 2, and my duties include investigating the trafficking of illicit controlled substances; and the importation and distribution of illegal substances. I have training and experience in multiple investigative areas, to include conducting investigations and make arrests based on violations of Title 21, United States Code.

7. Prior to September 2017, I was assigned to Cargo Based Smuggling Group for approximately 2 years. Prior to my assignment with the Cargo Based Smuggling Group, I was assigned to the San Diego Tunnel Task Force for approximately four years.

8. I have had approximately 23 weeks of intensive training at the Federal Law Enforcement Training Center at Glynco, Georgia. These 23 weeks comprised of approximately 12 weeks of the basic criminal investigator training program and approximately 11 weeks of ICE Special Agent Training. I have received training in identifying various controlled substances and conducting Title 21 controlled substances investigations.

9. Prior to working for HSI, I worked for the Federal Air Marshal Service, Special Agent in Charge, Boston Field Office, for approximately eight years and six months. My duties with Federal Air Marshal Service were to detect, deter, and defeat criminal and terrorist activities that target our Nation's transportation systems.

10. I have personally participated in and conducted investigations of violations of various State and Federal criminal laws, including those related to narcotics violations. I have arrested or participated in the arrest of persons for violations of the Controlled Substances Act. In these cases, I have conducted interviews with the arrested persons and their associates. I have conducted surveillance of narcotics smugglers as they conduct their smuggling activity while crossing the border from Mexico into the United States. Through

3

these investigative activities, I have gained a working knowledge and insight into the typical activity of narcotics smugglers, and the structure of their narcotics smuggling networks.

11. I have also spoken with other agents about their experiences and the results of their investigations and interviews. I have become knowledgeable of the methods and modes of narcotics operations. I have become familiar with the methods of operation typically use by narcotics traffickers. I have learned that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances. Based on my training and experience, I have learned that load drivers smuggling controlled substances across the border are often in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substances.

12. Moreover, I have learned that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes and manners for importing, possessing, concealing, manufacturing and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances. I have learned that professional narcotics operations depend upon maintaining their extensive contacts. The use of telephones is essential in maintaining timely long-distance and local contacts with the original suppliers and those down the organizational chain to the local traffickers. The telephone enables narcotics dealers to maintain contact with narcotics associates, narcotics suppliers, and narcotics customers. I also have learned that narcotics traffickers often use fraudulent information to subscribe to communication facilities, especially cellular telephones, and frequently change communications facilities to thwart law enforcement efforts to intercept their communications.

13. Based upon my training and experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Narcotics traffickers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b. Narcotics traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    c. Narcotics traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    d. Narcotics traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    e. Narcotics traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

    f. Narcotics traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or narcotics proceeds.

    g. The use of cellular telephones by conspirators or narcotics traffickers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

14. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

5

15. Based upon my training and experience, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, based upon my training and education, searches of cellular/mobile telephones associated with narcotics smuggling investigations may yield evidence:

    a.    tending to identify attempts to import methamphetamine or some other federally controlled substances from Mexico into the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

    d.    tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, cellular/mobile telephone(s); and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III

## **STATEMENT OF PROBABLE CAUSE**

16. On March 9, 2018, at approximately 11:20 p.m., Defendant drove a red Ford Mustang bearing Mexican plates (the vehicle) to the Otay Mesa, California Port of Entry, intending to cross into the United States from Mexico.

17. U.S. Customs and Border Protection Officer (CBPO) Grijalva and his Human Detection Narcotic Detector Dog – Passenger Processing (HD/ND-PP dog) encountered Defendant during pre-Primary roving operations. The HD/ND-PP dog alerted to the passenger-side rear quarter panel of the vehicle. CBPO Grijalva asked Defendant to park and turn off the vehicle. CBPO Grijalva then asked Defendant how long he had owned the car, if this was his first time crossing in the car, and where he was heading. Defendant answered he borrowed the car from his brother-in-law, he had crossed in it before, and he was going to Otay Mesa, CA.

18. CBPO Grijalva conducted a brief inspection of the quarter panel by looking under the fabric liner inside the trunk and found the void empty. Defendant was then directed to proceed through primary inspection and onto secondary for further inspection. In secondary inspection, CBPO Grijalva used a pry tool and flashlight to pull back the quarter panel near the door seam. He discovered black-taped packages concealed inside.

19. CBPOs removed 54 taped packages from the vehicle's quarter panel with a total weight of 26.39 kilograms. One random package was probed and its contents field tested positive for properties of methamphetamine.

20. Defendant was arrested at approximately 12:20 a.m. on March 10, 2018. CBPOs collected the Target Devices from Defendant at the time of his arrest.

21. At approximately 2:07 a.m., Defendant was advised of his *Miranda* rights in Spanish by San Diego Police Department Officer Luis Roma, who read from a pre-printed *Miranda* rights form. Defendant agreed to waive his rights and speak with us.

22. Defendant stated that the vehicle belonged to Joel Acosta (Acosta); Defendant initially referred to Acosta as his brother-in-law but explained that Acosta was actually just

dating Defendant's sister. Defendant stated he was going to "tell everything as it is" and he was going to be honest. Defendant denied knowledge of the drugs and that Acosta had offered him use of the vehicle. Defendant stated he had planned to walk across the border that day because he always crosses on foot but Acosta told him to wait just a little and he would be able to take the vehicle across. Defendant stated that Acosta instructed him to drive the vehicle and park it in a lot near the Otay Mesa, California Port of Entry. Defendant stated he was a little bit suspicious as to why Acosta was offering the vehicle to him but that he had confidence in Acosta. Furthermore, Defendant stated he did not know who the car belonged to, he had only observed Acosta driving the car, and he did not know how long Acosta had possession of the car.

23.  When I ran the vehicle's VIN number through law enforcement databases, the vehicle came back registered to EAN Holdings LLC, which I learned is the parent company of Enterprise, the rental car company. The vehicle was reported stolen to the Los Angeles, California Sheriff's Office on November 15, 2017.

24.  Defendant stated that when he entered the line at the Port of Entry, he saw his lane had a dog but he did not care and decided to go ahead and see what happened. He stated that the dog came up to his vehicle and became excited. Defendant stated that was the point he became nervous that something was wrong. Defendant stated he did not think the dog was alerting for real but he also had a lot of doubts that he was lent the vehicle so easily. He stated he was not very close to Acosta and that Acosta did lend him cars in the past but only to make short trips around Tijuana, Mexico. Defendant then clarified that Acosta had only lent him a car once before and it was a Chevrolet Silverado.

25.  I advised Defendant that his story was not believable and Defendant stated, "ok I will tell you the truth; I was going to bring money across."

26.  In response to how many times he had crossed contraband for Acosta, Defendant stated, "this is the only time I have done it." In response to how many times he had transported money in the past, Defendant stated "this was going to be the first time from Los Angeles." Defendant stated that he had transported money on one other occasion

from East California but then clarified he actually drove from Miami, Florida, to Terminal Island, in Los Angeles, California. Defendant stated he drove the money for someone he did not know and that he was informed it was approximately $9000 USD. However, he was there to observe the recipients count the money and Defendant realized the total sum was approximately $38,000 USD. Defendant stated he believed he was told it was only $9000 USD because he was only paid $700 USD to transport it.

27. Defendant stated he was traveling to Los Angeles, CA to transport $30,000 USD back across the border to Tijuana, Mexico. He stated he was to message Acosta when he reached San Clemente, CA, for further instructions on where to go and who to meet. He would stay in a hotel in Los Angeles while the vehicle was being loaded with money and then he would return to Mexico and be paid $3000 for the trip. Defendant stated he had asked if he was bringing anything north across the border and he was told no. Defendant stated he kept asking Acosta if the vehicle was loaded and Acosta told him each time that it was not. Defendant stated he informed Acosta that he would transport the money south but would not transport drugs into the United States. Defendant also stated he would have found out about the drugs once he got the instructions from Acosta.

28. Based on my experience investigating narcotics smugglers, Defendant may have used the Target Devices to coordinate with his co-conspirators regarding the importation and delivery of the methamphetamine, and to otherwise further this conspiracy both inside and outside the United States. I believe that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, email messages, messages and posts from social networking sites, pictures, and other digital information may be stored in the memory of a cellular telephone and may identify other persons involved in narcotics trafficking activities.

29. Based on my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics smuggling activities of Defendant and his co-conspirators, such as recent calls made and

9

received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, email messages, messages and posts from social networking sites, pictures, and other digital information may be stored in the memory of the Target Devices.

30. Drug trafficking conspiracies require intricate planning and coordination to successfully evade detection by law enforcement. In my professional training, education and experience, I have learned that this requires planning and coordination in the days, weeks, and often months prior to the event. Given this, I request permission to search the Target Devices for items listed in Attachments B-1 and B-2 beginning on December 10, 2017, up to and including March 10, 2018.

## III

## METHODOLOGY

31. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic

10

data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

32. Following the issuance of this warrant, I will collect the Target Devices and subject them to analysis. All forensic analysis of the data contained within the Target Devices and the memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

33. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## IV

## CONCLUSION

34. Based on all of the facts and circumstances described above, there is probable cause to conclude that Defendant used the Target Devices to facilitate violations of Title 21, United States Code, Section(s) 952, 960, and 963.

35. Because the Target Devices were promptly seized during the investigation of Defendant's smuggling activities and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by Defendant continues to exist on the Target Device. As stated above, I believe that the date range for this search is from December 10, 2017 through March 10, 2018.

//
//
//
//
//

36. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachments A-1 and A-2, and the seizure of items listed in Attachments B-1 and B-2, using the methodology described above.

I declare under penalty of perjury that the foregoing is true and correct.

Timothy O'Sullivan
Special Agent

Sworn to and subscribed before me this ___6___ day of April, 2018.

HONORABLE WILLIAM V. GALLO
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A-1**

### PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violation of Title 21, United States Code, Sections 952, 960, and 963 is an Apple iPhone, Model A1549, FCC ID: BCG-E2816A, IC: 579C-E2816A, IMEI: 355786073235090 (Target Device 1).

Target Device 1 is currently in the possession of the Department of Homeland Security, Homeland Security Investigations as evidence in the evidence vault located at 880 Front Street, Suite 3300, San Diego, CA.

## **ATTACHMENT B-1**

Authorization to search the Target Device 1 described in Attachment A-1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Device 1 for evidence described below. The seizure and search of the Target Device 1 shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of December 10, 2017 to March 10, 2018:

- a. tending to identify attempts to import methamphetamine or some other federally controlled substances from Mexico into the United States;

- b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

- c. tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

- d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

- e. tending to identify the user of, or persons with control over or access to, Target Device 1; and/or

      f.      tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.